United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good afternoon. Thank you. Our first case for today is 2019 11310 Smith versus Smith. Mr Capel, you may proceed. Thank you. May it please the court. I'm John Capel here on behalf of appellant Colin Smith in Colin Smith versus Sarah Smith. I will refer to the parties by their first names for ease of reference. This case involves the application of the Hague Convention on International Child Abduction, specifically determination of the habitual residence of the four Children, the subject of the suit, as well as the application of an age and maturity defense to the two oldest Children. With regard to the first issue, we're in a somewhat unique situation, given that while our appeal has been pending, the Supreme Court issued the Minaski opinion, which provided a new legal test for determining habitual residence under the Hague. The new test calls for the court to assess the totality of the Children's circumstances to determine where the habitual residence of the Children actually was at the time of removal. Now, wait, totality of the Children's circumstances or just totality of the circumstances? Your honor, I believe it would be both the Children and the parties, right? You said just Children's. Beg your pardon. Beg your pardon, your honor. Totality of everyone's circumstances. So it's your position that Larbi doesn't apply now, right? So it is our position that the shared intent standard established in Larbi has been superseded in large part because of the totality of the circumstances. So the trial court in this case applied Larbi. His determination from his findings of fact was that shared intent was the standard and that was the test. And because Colin could not objectively prove that he and Sarah had a shared intent to establish a habitual residence in Argentina, that habitual residence was not in Argentina. And so he was not entitled to return. Um, we're not dealing with shared intent anymore. We're hotel. In fact, the intent is, as Justice Ginsburg discusses, that can lead to all sorts of issues about intent. And so what we're dealing with now is just what did the totality of the circumstances say? Can we tell what they say based upon the findings of fact, the other findings of fact that the district court made? So I believe yes, and I think actually both sides are in agreement with that. We don't believe that different facts would be introduced into evidence if the case were to be retried. And so, while the wrong legal test was applied, we believe that all of the basic underlying evidence and facts were in fact before the court at trial. And so our request of this court is to apply the monastic test, apply totality of the circumstances based off the evidence in the record and then make a determination about habitual residence. And how would we apply it here? So I believe the standard review is de novo and based off the fact that the underlying test was not applied because the trial court used the wrong legal test. I don't believe there's any deference to the trial court's determination. And so that's a poor question. My question is, how do how do how do you win under the totality of the circumstances test using the facts found by the district court? That's correct question. I meant to ask. I beg your pardon, Your Honor. Um, so a lot of the facts are actually undisputed in this case. The intent of the parties is facts that are not specifically the fact that the parties moved from California to Argentina and remained down there for two years. They maintain no residents of physical residents in the United States while they were in Argentina. Well, they did have property in the United States. The wife had property. Yes, Your Honor is correct that, um, Sarah did inherit some land in Parker County, near where she's living right now. It was somewhat unclear from the record, as it's not included in the party's divorce decree, whether they had that before or after they moved down there. But at no point in time had anyone actually used that property as a residence before they moved to Argentina or while they were in Argentina, based off what the parties testified to. Um, and the parties both testified they never resided in Texas together with the Children at any point in time. Um, so we're only dealing with the two older Children, not with the baby, right? So there's four Children. The subject of this case, there was a fifth child mother became pregnant due to a paramour that she engaged with down in Argentina. That's not no, no, no. But that's a way for more discussions. That's not just there's a fifth child, but that's not one of the Children of the two parties. That's correct. What are the four Children? I have a question. Then the briefing discusses that the two Children and the district court's opinion said 2000 and nine was the birth or 2019. I think that was an error because they said the job was 10 in the district court opinion, even though the date of birth was 2019. I think that was 2009. It's a typo. The two older Children are the ones that are deemed to be able to make their own decision. Is that correct? Well, five arguments. Yes, a bigger partner. The two older Children were interviewed, and so the district court did, um, apply the age and maturity exception to them. Obviously, we don't agree, particularly with the youngest child that she actually had sufficient age and maturity to object. She was only 10. At the time of the interview, there was a significant amount of evidence just from the transcript of the interview that she was quite immature, still had problems with bedwetting, learning difficulties. There was a significant parallel between her situation and the child in the England case from this court was actually an older child, but similarly had learning difficulties. And this court ultimately determined that child not to have been a have sufficient age and maturity to object despite the district court's termination in that case. So we believe there was an error in that situation. But I think back to the court's question, the age of maturity exception was only applied to the eldest two Children. It was not well, the 10 year old had dyslexia. As I understand it, are you saying that makes her incompetent of expressing her mature wishes? Well, Your Honor, so I do believe a learning disability is a factor based off of the precedent set in England. It's not the only factor. I think listening or just a reading the actual transcript itself, seeing the way she talks. I mean, she uses grammar and verbiage very much like a child would, which shouldn't come as a surprise to anyone because she is a child. And so, you know, the assertion that she's sufficient age and maturity. I don't think it's a given, particularly given the lack of other testimony from an expert, either an ad litem or a psychologist. A lot of the case precedent where this exception is invoked. Um, there's an expert who provides testimony by age and maturity that didn't happen here. Um, both parties made some comments in the record about well that they thought the Children were sufficient age and was in favor and column was against. Um, and then the court interviewed them, and it was not a particularly lengthy interview, and the findings effect or only one less than half a page each on both of them. But we can't do the maturity finding, though, on the other two Children for sure. And nobody's suggesting that we split up the kids. Are they? I mean, so we have to have totality of the circumstances separate and apart from the maturity issue. This is not like an Abbott the Abbott, where the person aged out by the time they finally got back to the district court. Correct, Your Honor. Nobody attempted to invoke age and maturity for the youngest Children. I do think it actually was pled for the third child, but it wasn't considered by that. So we have to look at the totality that if we're gonna keep if nobody's saying that Children should be split up, right? Certainly not us. We would certainly prefer the Children be kept together. I made. So what are the circumstances that support your client winning this case? Well, so that turns on habitual residents. And so our belief is that the evidence in the record points toward habitual residents being in Argentina, both because of the length of time they were there. But the real distinguishing factor of this case, which I think is very unique compared to most other cases in the Hague, is we already have a foreign custody order from the country at issue. Normally, in Hague cases, this was through a mask. He there's a question about where's the habitual residents because we need to determine what the appropriate form is to have a custody determination. You know, it's not meant to determine custody. Well, in this situation, that bell's already been wrong. We already have a foreign custody order. We don't have to wonder, you know, should it be Texas or should it be Argentina where we make a custody determination? It already happened. The parties did it in agreement. And so that's a very unique situation that's not present in any of the other case law that was brief. Um, and it creates this odd problem. I mean, if the Children aren't returned on this Hague action, then Argentina court will have jurisdiction over the kids for further custom determinations based off the last determination. And under Texas law, Texas court wouldn't be able to exercise jurisdiction over them because there's this foreign order and there's no agreement to set it aside or modified Texas. And so it's like they'd be stuck in this sort of legal limbo, which is something that in the case, one of the cases involving Mexico. Yes, I believe the courts referring to the Farby Kendrick case that Sarah provided. That was a ninth circuit case handed down a couple of weeks ago. I thought we had a case like that. Where was the parents were fighting in Mexico was a possible venue. An older case that we had at anybody. Go ahead. Yeah, I don't remember off the top of my head, but I'm happy to take a look. And if I could find that I'll do some supplemental briefing on it. But she can't go to Argentina then because she doesn't have a visa. Then how does that work out for sharing custody in Argentina? So I don't believe Colin actually agrees that it's not possible for her to go to visas at the time they left. I know she testified that she didn't have a valid visa at the time she left. However, I don't think there's enough evidence in the record to make that determination. And I believe his testimony was that I mean, to whatever extent she needed assistance with a visa, he'd support it. He didn't want her to leave, but he wasn't gonna be working in Argentina going forward. It's pussy anyway. No, he was your honor. So there was assertion made a trial that he was only had a two year employment contract. That's not accurate. I mean, the two years had long since expired by the time we had trial. He was still so employed, and he indicated that in the record. It was there was a two year span where he received certain heightened expat benefits as an incentive to move them down there, and those expired. But his employment did not. So he's not moving some third, some new place that's not in the record that he's about to move somewhere else. She alleged he was moving to India. And I realize this is not a form for adding facts. I'm not into that, but there's nothing in the record indicate he's actually moved anywhere. Okay, I think Judge Park still has a question for you. Well, you said you'll do some supplemental briefing. You need to get permission from Judge Elrod for that. That's yes, sir. Second, the point you're making about the documents in Argentina and how a Texas court can't do anything about them. I just don't remember that being particularly urged in your brief. Now I could be wrong. We've only got 22 cases, 21 cases this week. But, uh, did you urge that in your brief? Yes, Your Honor. So in our initial brief that is brought up, and then it's also addressed in the reply brief because Sarah gave her response to it in her sponsor brief and stated again. So under the Uniform Child Custody Jurisdiction Enforcement Act, which is a Texas law, Texas does not have the ability to exercise subject matter jurisdiction for child custody if there's a foreign custody order like we have in this case and one of the parents story, the divorce in Argentina. Correct. That's what you're referring to. Yes, Your Honor. And the divorce granted her custody of the Children didn't well, I believe it referred to a shared custody. Don't don't don't use believe with me. Did it grant her custody of the Children? Not exclusively, Your Honor. It was a shared custody arrangement. Both had possession. Both had parenting rights. It's your primary custody. I beg your pardon, Your Honor. I don't believe it says primary custody. It's just shared straight up shared, isn't it? My recollection is the term is shared rights and duties. It doesn't specify a primary parent or a custodial parent versus a non custodial. I understand it granted Sarah primary custody of the husband custody rights whenever he was not traveling. I do believe it says he has custody rights when he's not traveling, but he has a possession schedule with weekly possession and rights and duties. He has primary. Is that correct? I just I don't believe that's what it says, Your Honor. All right. They were supposed to alternate during the week. That's correct. There were Tuesday and Thursday periods of possession as well as weekend possession, and there's very clear language that they were supposed to attend a school in Buenos Aires that they were attending and that some of the exchanges were to be at the parents houses or at the school itself. And so that arrangement it's just not workable over any significant distance for anyone were to leave Argentina, and it was entered just less than a year before she chose to leave. Her position was a trial that she always had this intention, um, to be that they would have entered this arrangement in 2018. That's completely unworkable over a long distance. If that really was actually always what they plan to do, why would they have incorporated language in the decree facilitating long distance possession or move back to the United States? They certainly could have done it, but they didn't do it. Instead, they entered into this agreement only workable down there. As I have written, we're really ill suited to be the ones to try to deal with these child custody issues and that in the time periods that it takes, this is just a very difficult and cumbersome process that we're not well suited for it as an appellate court. But we must do it. And so I'm Can you please just give us the four or five or how many there are totality of the circumstances that cut in your favor so that if we were going to list them in an opinion, we would know what they were. Yes, Your Honor. So the biggest point is the existence of the foreign custody order and the implication that carries the length of time the parties were in Argentina, the attendance of school in Argentina, the terms of the custody arrangement involving continuing to attend school in Argentina. And then I would refer the court to the fact that Sarah maintained an active lease at the time she left. In fact, that I just reviewed it this morning. At least still would have been in effect as of this month. If she had still been down there, it was a two year lease signed two years ago in September of 2018. All of these things suggest long term residency in that country, which leads to habitual residence. Um, obviously, I'm your argument. Yes. Yes, Your Honor. And I see about time, so I will yield. But before you stop the lease that was signed in 2018, that was when they were getting their divorce finalized in Argentina. Yes, Your Honor. The divorce was finalized in December of that year, so that was before it was finalized. Thank you. Thank you, Your Honor. Mr Leopold. Thank you, Judge. May it please the court. Paul Leopold for Appley. Sarah Smith. We're asking the court to affirm the district court's judgment because there was no clear error in the district court's findings of fact, and I believe under the Minaski case, this court should review those findings of fact under a clear error standard. As the Supreme Court stated in Minaski, the district court, the fact finding court is the court to make this determination and the mixed question of law and fact for habitual residence. The Supreme Court said it's barely a mixed question because it's mostly factual. The first part of it is just which standard to use. That standard the Supreme Court gave us is the totality standard. The second question is really the bulk of it. Were the Children at home in this place that the petitioners claiming the district court? So it's very unclear whether or not the opinion in Minaski says that it's clear error that it should be for or de novo. The court talks about all the benefits of clear error, but at paragraph before, uh, it says that some federal courts have reviewed habitual residence in de novo, and there's no uniformed historical reasoned approach. Your your your client's case does not depend upon clear error, does it? It does not depend on clear error, but I'm in the Maskey case. What the Supreme Court was saying the way that I read it, at least is that there have been courts that reviewed it de novo, but that's actually the question that the was with what air? What standard to use on appeal to review these types of cases? Well, it talks about benefits of clear error, and it talks about how it's it's the district court, but it never actually comes out and holds that. And so that's what's confusing about the opinion. Do you believe that we can follow larvae in all of that analysis about the shared intent? Uh, the district court underwent or do you believe that's been displaced? I'm asking. I don't think it's been entirely displaced. Even in Manaski, the Supreme Court said that shared intent. It doesn't turn on shared intent, but that's still a fact to consider among the totality. The big thing in our circuit in all of these cases since since larvae for certain we have been really all about the shared intent and where we didn't find shared intent. We found Children didn't have a habitual residence, which is exactly the opposite of what Manaski wants to have happen. Yes, Judge. In larvae, this court did say it starts with the shared intent, and it relies heavily on that. But it also said that it is a fact intensive determination, which when looking at especially at the far case, which I think is the only case that's in a similar procedural instance that we have here, where the district court did not use a totality standard used a similar shared intent standard. And even in the district court in Manaski used a similar shared intent type standard. The far court relied on Manaski and gave deference to the district court and to its findings. I think here here under larvae in that fact intensive determination, the district court did make a fact intensive determination. It went through three pages of findings going for nearly 20 years of this family's life from when the parents first met in 2001 all the way up through the time of trial. But we don't need to. But it makes a bunch of findings dealing with shared intent under larvae that are not pertinent anymore, are they? They are still pertinent looking at the totality of the circumstances. It doesn't turn on that alone, but it still is pertinent. And I looking at you. But do you agree that the other the other factual findings are enough and we don't need to send this back even if the court inappropriately used the prior Fifth Circuit standard? Yes, because of the fact intensive determination that it made even under the larvae standard. Is that on? Can you tell us what the totality that cut in your way cut in your direction are? Can you list them in kind of a bullet point fashion, please? Yes, absolutely. So looking using the findings of fact that are in the court's record from pages 476 to 479, the parties met in 2001. They got married in Texas. They're both U. S. Citizens. They had Children here in the United States that are all U. S. Citizens. None of them have dual citizenship anywhere. They moved around the United States for father's jobs or education. They had never lived outside of the United States together or with any of the Children. When they did talk about going down to Argentina, the contract for father, his employment contract said that, just as Mr Capel said, it was giving them two years worth of housing allowance, two years worth of education allowance for the Children. It would even ship the family back to the United States. Upon termination, it also said that it would pay for the family to travel back to the United States for their vacations while they were down there for those first two years. And then looking at while they were down in Argentina, I'll leave provision correct. So the employment agreement refers to the United States is home. Yes, it specifically says U. S. A. That they'll go home, pay for them to go home to the to the United States for those vacation times. Then looking at the school while they're down in Argentina, the father testified it was an American school taught by American teachers at the American grade levels in the American style, and it was even set up so that they could spend their summers in the United States. And looking at the decree, which the district court heard the evidence about the decree about getting divorced down there also looking at the decree, it doesn't require anyone to live in Argentina or for the Children to attend school in Argentina. Looking at page 33 of the record in 34, it goes through the possession schedule. The father shall return the Children to the school they were attending by the Buenos Aires International Christian Academy. It didn't require them to go there. And looking at page 33, the child support provisions makes that clear because the father was supposed to pay for child support, and as part of that would pay for tuition for school. And it said that at the time they were attending Bica, but it said they could attend any other institution with similar characteristics. So even in their decree, they're not limited to only an Argentinian school or school in Argentina somewhere. It just made the father pay for that schooling at any institution with similar characteristics as a practical matter. If we were to agree with you, what would happen with the custody arrangements? Could that decree be taken into Texas court to modify that, you know, given that one parent is currently living in a different country? It's not a... What happens to the existing custody arrangements that have been adjudicated by the Argentinian court if we were to determine that the Children's residence is habitual residence is Texas. So it is somewhat speculative because no modification has been filed. But under the U. C. C. J. E. A. The Uniform Child Custody Enforcement Jurisdiction Act, Texas could modify. And this is all, I think, adequately briefed on both sides that Texas could modify under certain conditions, either if the Argentinian court finds that it's no longer a convenient forum. If father moves out of Argentina, under the U. C. C. J. E. A. It's if the parties and the Children all move outside of Argentina right now, because the mother and the Children have it would just be father. If he's still there once he moves out, then Texas itself could make that finding that everyone's moved out. What if he stays in Argentina? If he stays in Argentina, Argentina could still find that it's an inconvenient forum. And I also think there is another new case out of the Texas Supreme Court discussing the U. C. C. J. E. A. Which is it isn't in the briefing. It came out a few days after the Apple East brief was filed. Um, in Ray D. S. And I can provide that supplemental briefing if you if you like, Judge. But in Justice Lehrman's concurring opinion, she said the court didn't actually get to this question. But looking at the U. C. C. J. E. A. It's not a true subject matter jurisdiction statute, and that's made clear because if if a trial court makes a U. C. C. J. E. A. Error that air that judgment is only avoidable, not void. If there were a true subject matter jurisdiction error, that judgment would be void. But the U. C. C. J. A. A. As Justice Lehrman explained it, the U. C. C. J. E. A. Looks at where the custody should should happen where that trial should happen, which is really what the head convention is saying to where should what? What's the best court to determine best interest of the Children? Now, Council, what do we do with with with the situation that there is this custody determination and in our precedent? That's that does have some that does have some authority for the other side winning. It's not. It's not enough by itself, certainly. But if cuts the other way, it's part of that, right? But it's a factor that cuts the other way under our precedent. It is more favorable to the other side. Yes. But at the same time, looking at the convention under Article three, it says that custody determinations are what give custody rights. That is part of the wrongful removal determination, not necessarily habitual residents determination. I think saying that because there is a custody determination somewhere that makes it habitual residents. I think that's kind of reversing what the head convention is actually saying. Just because there is a custody determination doesn't mean that is where the habitual residents is. Now, we have a case where we've determined a habitual residents to be a different place than a custody determination. Not out of the Fifth Circuit, but out of the Ninth Circuit, the far case that I supplied last week in our 28 J letter that it was Mexico that determined or that had the decree and the Arizona District Court found that Mexico was not the habitual residents of the Children and the Ninth Circuit, giving deference to that determination affirmed on appeal. Are you relying on this determination that the Children can decide for themselves? Not entirely. That's an issue. If if this court determines that the habitual residents determination is incorrect, then under the second issue, the two oldest Children did display the age and maturity and did object to going back to Argentina. And I agree with Mr Capel. We're not asking the court to to separate the Children, but the other Children at the time were under the age of 10. I believe that the Second Circuit has found an eight year old to be sufficiently mature. But in this particular case, mother didn't think that her younger Children were mature enough to be able to give their opinion on it. And so just the older Texas law, not me and none of the Children would be old enough to give the opinion. Would they under Texas law? I don't believe I think that you had to be 16. And that's what happened in the Abbott case. He turned 16 while it was in Judge Eagles Court. No, Judge, I believe for the 16 age limit, that's because the the Hay Convention does not apply to Children under 16. He aged out. And so while the whole thing was going back and forth and back and forth, he aged out. But none of these Children have aged out, and it's not clear. There's not a clear age requirement that says when you're mature enough, correct? It is. It is a fact intensive determination, just like habitual residents. And under this court's precedent in Rodriguez that we briefed Rodriguez versus Yanez, it's it's reviewed for clear error. So looking at the district court's findings, the district court heard testimony from the father, from the mother and from a close family friend, and then interviewed to the two Children in camera. Reviewing all of that testimony and the sealed record, the Children were able to. The district court found that both of them were exceptionally calm and composed and that they were able to talk about their life down in Argentina, their life here in the United States, why they wanted to stay in the United States. The older child talked about wanting to finish out her high school career in Texas because moving around so much previously, it's hard to adjust. It's hard to stay on track and make those adjustments with those frequent moves. She talked about attending college in the United States and the opportunities that she had and the younger Children. Yes, she did have dyslexia, but I think that contrasts with the England case because the child in that case, although she had learning disabilities, she was also scared and confused during the in camera interview here. The district court found that even the younger child was calm and composed and that she was able to articulate herself. The district court interviewed her and she talked about her life down in Argentina and her life in America and that she recognized that she did have these learning disabilities and that in Argentina she wasn't receiving help for them, but she was receiving help in Texas and that she understood she was overcoming those learning disabilities because of the help she was receiving. And the district court made clear it's not determining best interest because of where she can get help or not. It was just using that as information to show that she was mature enough to understand what was going on and that she was receiving that help. I want to clarify two things. First of all, uh, the and you just confirm this or say it's say I'm wrong. But again, I understood that the wife received primary custody of the Children in the divorce decree. The decree doesn't use the word primary, but but it does give the father a broad meeting scheme, which I think is the same thing as giving the mother primary. Wasn't there some translation difficulty? I remember a footnote in the district court's opinion of the term with translation between primary and actual or something along that line. The translation difference was whether the decree actually used the phrase habitual residents or not, not with primary. And so here go ahead. No, you finish up. So here in the decree, it doesn't use the word primary, and it doesn't talk about primary residents. It doesn't talk about residents at all, really. But the mother was receiving child support. She was supposed to be receiving language in the decree concerning the mother's custody rights, and then it gave father a broad meeting scheme and ordered him to pay child support. All right. Second question. Judge Elrod's been asking you about the difference between the two older daughters and Children and the two younger. What is the position? Maybe the parties have agreed on this. If we should rule that that the father that the Children returned up Argentina or the two oldest going to stay here in America. Has there been some resolution of that? There isn't a resolution on that. We certainly don't want to split up the Children. If if the court determines that the habitual residents determination is incorrect, but the age and maturity determination is correct under clear error, I think in the it's hard to say best interest of the Children because that's not what you're deciding. But as the as the father stated in his brief, he would ask for. I see my time is up, but may I finish this? Oh, I'm sorry. It's just all right. Okay. Actually, I think it's okay. There we go. Two minutes and 36 seconds left. Yeah, thank you. I'm sorry about that. So as the father stated in his brief, if there is that mixed, no one habitual residents. Yes, on, um, agent, then to remand it for the district court to determine what should happen. I think that's one of the appellants requests for his requested relief on appeal. I'm not sure that is the pellets request. And I'm gonna ask Mr. Lawmore guests or that question in a minute because I thought Mr Kapel said that we could just decide on the record here and that the facts were adequately presented, and we don't need to remand for the court to adjudicate anything further. That is their argument on an oral argument. If you look at page 30 of their brief, I know it's not the same as the brief. Yeah, and that that's what just what I was pointing out. I think on this record. Yes, this court can just like in Manaski and in far, this court can determine that Argentina was not the habitual residents. Both both Manaski and far those those district courts did a similar, uh, shared intent type standard. And on appeal, the the Ninth Circuit in the Supreme Court both said that they effectively did a totality of the circumstances standard because they did this fact intensive determination, which is the same standard. I believe this court put out in larvae. It's a fact intensive determination, and the district court's findings on page 4 80 even say even quoted larvae, saying it is a fact intensive determination. So looking at that, this court, I believe, does have enough information in the record. And as a pound has said, there isn't any additional facts that need to be heard at this point. And so just like in far and Manaski, the trial court effectively did a totality of the circumstances standard by looking at all the evidence, looking at nearly 20 years of this family's life moving around the United States. And so what do we do with this going to India point? Is that outside the record? And we shouldn't consider that at all. For what is in the record, father did admit he did talk to the Children about moving to India, although he said it was jokingly talking with the Children. So it is not in the district court's factual findings. Is it correct? Correct. It's just in the in the child in your brief for some reason, even though it's not in the factual findings, it's in the transcript as well, but not in the factual findings. Correct. Okay, so father did admit it. He did talk about it at the trial, and so it's not part of the factual findings, but he rely on the factual findings in the district court, don't you? I believe the factual findings are reviewed for clear error under Manaski and under FRAP 52 a six. But it's also I think to determine clear error, this court has to review the record in its entirety, and we're asking the court to affirm. Thank you very much. Thank you. You may proceed with your rebuttal. May it please the court. So I wanted to go to the court's central question and address that because the court has said it's ill suited and kind of how do we win in looking at Manaski? But if you really look at all of this court's prior opinions and most opinions, I'm on to what Manaski says. It's the convention's core premise that the interest of Children and matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence. And so in this particular case, obviously, we've argued that's already been done. We have in here, different from the far case, an agreed custody order. In it, just Judge Barksdale. It talks about parental responsibility. The parties agreed to jointly assume and exercise obligations related to parental responsibility under provisions contained in section 6 41 subsection B of the Civil and Commercial Code. And obviously, dad is getting visitation. Mom arguably has the child for more time than the primary custody. I mean, they're gonna live with the mother except when he gets visitation. As I think of it, I would agree with you. Uh, it's just someone who's primary. I would think of the person who has the more visitation, let's say so that in this case, obviously his mother. Uh, however, the decree itself contained detailed provisions referring to travel to country of origin even mentions a habitual visitation scheme. And so I think this case is easier than than most because and all the other ones I've been involved in. And in most of the cases go to the argument. Where? Where is this gonna be to determine to have this custody fighting? And then when we look later in Manaski, it says the aim is to ensure that custody is adjudicated and what is presumptively the most appropriate form the country where the child is at home. So the Texas statute the court discussed earlier says it's 1 52 to both of me. It's on page 45 of Mr Leopold's brief. A Texas court has jurisdiction to modify the determination of another state of foreign country. If the Children have resided in Texas for at least six months and either the other court, Argentina determines it no longer has continuing exclusive jurisdiction to the other court determines that Texas is a more convenient for him or three. A none of those things have happened. I would argue for a clear line is to where hopefully we were headed under Manaski. We know where this custody adjudication was. The mother had every right to petition for a move away from Argentina to petition for a change. And instead she uses self help, which is really in my mind, a very bad idea for this convention. We ought to have a consistent application where parents can rely on this. There is no such thing as an expat exception in this convention. There's no such thing saying you have to become a resident of the other country. Obviously, Mr Capel pointed out some of the facts, but a key fact is this agreed decree, which really Miss Manaski was arguing. In her case, you ought to have an actual agreement in the United States Supreme Court rejected that you have to have it. But in this case, we have it. We have an agreed order that fixed where they were gonna do these custody decisions. So didn't they have an order in the Zosky case? And we didn't when we found that that was not determinative. Um, obviously that was under, I believe the prior test. Um, I don't know that for a fact, but if you're saying that Judge Elrod, I'll take that is true. And that's why I say it's a fact. But when you look at the totality of the circumstances, I think that's a very strong fact. Obviously, it's not looked at in isolation. We're looking at the rest of the record. But, uh, I think that that's a key fact that they agreed to this custody order. Unlike the far case where that was taken basically after the mother had left Mexico. Okay, I think you need to wrap it up. I am finished, Your Honor. Okay, thank you. Thank you, Counsel. We have your argument. We appreciate it. Very difficult situation.